UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ISAIAH DOXEY,

    Plaintiff,

v.                                               Case No. 1:13-cv-1175
                                               Hon. Robert J. Jonker

ERIKA HUSS, *et al.*,

    Defendants.

_____/

## REPORT AND RECOMMENDATION

       This is a *pro se* civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on motions for summary judgment filed by defendants Jared McConkey, Kirt Schafer, Nathan Badryka, Anne Maroulis, Kevin Wood, Troy Jones, Matthew Wellman, and Nakita Haynes (docket no. 52) and defendant Michael Kennerly, P.A. (docket no. 78).

       **I.**    **Plaintiff's complaint**

       The Court previously summarized plaintiff's complaint as follows:

       Plaintiff Isaiah Doxey is a state prisoner incarcerated by the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF). Defendants are Daniel Heyns, the Director of the MDOC, and the following employees at ICF: Warden Kathy Stoddard; Deputy Warden Erika Huss; Resident Unit Manager (RUM) "Unknown" Ball; Sergeants/Corrections Officers "Unknown" Woods and "Unknown" Riske; Corrections Officers "Unknown" McConkey, "Unknown" Schaffer [Schafer], "Unknown" Bgverka,[Badryka] "Unknown" Risk, "Unknown" Jones, "Unknown" Wellman, "Unknown" Shreve, "Unknown" Haynes, and "Unknown" Thebo; Physician's Assistant (PA) "Unknown" Kennerly; and Nurse "Unknown" Mouralis. (*See* Compl., docket #1, Page ID#4.)

       According to the complaint, on March 9, 2012, at approximately 7:30 a.m., PA Kennerly, Nurse Mouralis, Sgt. Wood, Officer Jones, and several unidentified prison officers "rushed" into Plaintiff's cell while he was lying on his bed. (Compl., docket #1, Page ID#4.) They then started to press on his pressure points in order to

"force" him to give his "vitals." (*Id.*) Plaintiff assumed a fetal position, "screamed" for them to stop, and "refused medical attention numerous times." (*Id.*) Someone told Plaintiff, "[Y]ou can't we[']re going to taze you." (*Id.*) Defendants and the other officers then decided to leave the cell. One officer asked Sgt. Wood, "[D]o you want to cuff him up? Let's cuff him up." (*Id.*) Sgt. Wood replied, "[N]o, we're [going to] gas him." (*Id.*) Five minutes later, the officers "gassed" Plaintiff, even though they knew that he has chronic asthma. (*Id.*)

Plaintiff asked to be removed from the cell because it was filled with gas, and he backed up to his door to be cuffed. Officer Jones opened the flap on the cell door to look into Plaintiff's cell and told him to back up to the door, even though Plaintiff was already at the door. Plaintiff stated that he was at the door, but Jones replied, "No you're not." (*Id.*) Plaintiff contends that Jones deliberately ignored Plaintiff's compliance in order to force Plaintiff to remain in the gas-filled cell for a few additional minutes. Finally, after Plaintiff started knocking on the door, Jones and the other officers put him in handcuffs and removed him from his cell. As they did so, they "tried to break [his] arms on the slot," even though he was not resisting. (*Id.*)

Immediately after leaving his cell, Plaintiff asked for his inhaler because his lungs were "on fire" and were so constricted that he could not breathe. (*Id.*) Nurse Mouralis had his inhaler but she refused to give it to him, telling him that he would not receive it until he was given a medical examination. Plaintiff was then taken up some stairs, with the officers bending his fingers and arms into a painful position. (*Id.*) On the way up the stairs, an officer pulled down Plaintiff's underwear in order to humiliate him. Plaintiff was then taken to a shower.

Plaintiff asserts that another prisoner, inmate Williams, was supposed to clean up the gas inside Plaintiff's cell while Plaintiff was in the shower; however, when Williams entered the cell and started choking due to the gas, an officer told him to leave, saying, "[W]e just need to make it look good for the camera." (*Id.*) As a result, the cell was not properly cleaned and Plaintiff was forced to return to a cell that still contained the gas. Plaintiff claims that the gas exposure damaged his lungs, requiring long-term treatment with a steroid called Qvar. Plaintiff filed a grievance regarding the foregoing incidents on March 10, 2012, but he never received a response.

On May 16, 2012, Officer Shreve refused to give Plaintiff his lunch tray. Plaintiff claims that Shreve did this to deter Plaintiff from filing grievances or seeking redress for the exposure to gas. On three other occasions, other officers who are not named as defendants also refused to give Plaintiff his food trays.

Approximately one year later, Plaintiff met with an analyst from the office of the MDOC Ombudsman regarding the gas incident. On or about May 14, 2013,

Officer McConkey told Plaintiff that he would be assaulted for speaking to the Ombudsman. McConkey also told a prisoner in the cell next to Plaintiff's to "go through [the] wall" and assault Plaintiff, because Plaintiff was a "rat," but the prisoner refused. (*Id.*)

On or about May 30, 2013, McConkey allegedly told Officer Wellman to refuse to give Plaintiff a shower because Plaintiff wrote a grievance against McConkey. Wellman did so.

On or about August 22, 2013, Officer Thebo refused to give Plaintiff his lunch tray, stating, "[T]ry not to piss off 2nd shift and you'd get your trays. It isn't personal." (*Id.* at Page ID#5.) The next day, Officer Risk spit in Plaintiff's food, allegedly in retaliation for Plaintiff's "issue with McConkey" and for Plaintiff's complaints to the Ombudsman. Later, Officer Schaffer [Schafer] stopped by Plaintiff's cell and asked him, "[H]ow'd [you] like that spit loaf?" (*Id.*)

On or about August 27, 2013, Officer Schaffer [Schafer] tore up Plaintiff's mail and told him, "If you continue to write grievances we[']re going to beat your ass like we did Harry." (*Id.*)

On or about August 28, 2013, Officers Bgverka [Badryka] and Schaffer [Schafer] refused to give Plaintiff his food tray, calling him a "rat." (*Id.*) The next day, Officer Schaffer [Schafer] threw Plaintiff's food tray into his cell, causing the food to land on the floor. Officer Bgverka [Badryka]observed the incident and did nothing to stop it.

On or about August 31, 2013, while they were handing out food trays, Officer Haynes told Officer Schaffer [Schafer], "I think we[']re short a tray." (*Id.*) Schaffer [Schafer] responded, "[N]o Doxey's not eating[;] he's been lying on McConkey and Wilson." (*Id.*) Haynes did not give Plaintiff a food tray. Schaffer [Schafer] also stated, "[G]ot me a new shirt yesterday, know what it says? Stop snitching!" (*Id.*)

On or about September 15, 2013 [September 5, 2013], Officer Schaffer [Schafer] refused to give Plaintiff and inmate Harry their "store bags," stating, "You niggers don't have shit coming!" (*Id.*) Schaffer [Schafer] later came to Plaintiff and said that he would give Plaintiff his bag if Plaintiff took inmate Harry's bag. Plaintiff refused. Plaintiff and Harry did not receive their bags until 9:30 p.m. that evening, while other prisoners received theirs at 3:00 p.m.

Plaintiff claims that he lives in constant fear for his life and his physical safety. He asserts that unit one at ICF is "notorious" for "malicious, sadistic and wanton infliction of pain," and that "[t]aking prisoner's food trays, showers, mail and yards [is] the norm," as is "[j]umping on prisoners in handcuffs and using chemical agents unjustifiably and excessively." (*Id.*) He claims that Defendants Huss,

3

>Stoddard, Ball, and Heyns are aware of the other Defendants' "propensity to be violent" and "propensity for harming prisoners"; however, they did nothing to prevent the harm to Plaintiff. (*Id.*) Plaintiff asserts that Huss, Stoddard, Ball and Heyns "tacitly encouraged" the other officers to do as they pleased. (*Id.*)
>
>As relief, Plaintiff seeks compensatory and punitive damages, as well as criminal charges against the officers who used excessive force on him.

Opinion (docket no. 29 at pp. ID# 122-25) (footnotes omitted).[1]  Plaintiff seeks $7,000,000.00 in damages and other relief.  Compl. (docket no. 1 at p. ID# 6).  The Court previously dismissed defendants Heyns, Huss, Stoddard, Shreve, Risk, Riske, and Thebo, and ordered service of the complaint on defendants McConkey, Schaffer [Schafer], Bgverka [Badryka], Kennerly, Mouralis, Woods, Jones, Wellman, and Haynes. *See* Order (docket no. 30).

## II.    Summary judgment standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.  *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984);  *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Defendants seek summary judgment on plaintiff's claims.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further

---

[1] The Court notes that the final incident involving defendant Shafer allegedly occurred on September 5, 2013 rather than September 15, 2013.  *See* Compl. (docket no. 1 at p. ID# 5).

4

provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. Discussion

#### A. Exhaustion

Defendants seek summary judgment for lack of exhaustion. The Prison Litigation Reform Act (PLRA) provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

#### B. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved,

then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### C. Plaintiff's retaliation claim against defendants Wellman and McConkey

In Grievance No. ICF-13-06-1156-17i ("1156"), plaintiff claimed that he was denied a shower on May 30, 2013, stating that defendant Wellman told him that the denial was courtesy of defendant McConkey, and that the denial of a shower was retaliation. Grievance No. 1156 (docket no. 53-11 at p. ID# 231); MDOC Prisoner Step III Grievance Report (docket no. 53-11 at pp. ID#221-23). In their brief, defendants concede that plaintiff properly exhausted this claim against defendants Wellman and McConkey (i.e., "limited to the narrow claim of being denied a shower on a single occasion"). Defendants' Brief (docket no. 53 at p. ID#181).

### D. Plaintiff's remaining claims against defendants Wellman, McConkey, Schafer, Badryka, Kennerly, Mouralis, Woods, Jones and Haynes

#### 1. Eight exhausted but unrelated grievances

7

Defendants point out that plaintiff has exhausted eight other grievances to Step III, but that none of these grievances address any of the claims in this action. *See* MDOC Prisoner Step III Grievance Report. The substance of these exhausted grievances are as follows: Grievance No. ICF-13-06-1158-17z (on June 1, 2013 Corrections Officer Wolever gave plaintiff a meat tray instead of a veggie tray) (docket no. 53-11 at p. ID#227); Grievance No. ICF-13-04-0876-12bl (on April 15, 2013 plaintiff was denied mental health treatment) (docket no. 53-11 at p. ID#236); Grievance No. ICF-13-04-0812-17i (on March 29, 2013 plaintiff was denied envelopes and stationery) (docket no. 53-11 at p. ID#241); Grievance No. ICF-13-04-723-09e (on March 23, 2013 plaintiff was denied a protein substitute for the sausage on the waffle tray) (docket no. 53-11 at p. ID#246); Grievance No. ICF-13-01-0067-20e (on or about November 7, 2012 plaintiff was not allowed to eat "Halal certified meals") (docket no. 53-11 at p. ID#254); Grievance No. ICF-12-05-0885-17i (on May 16, 2012 plaintiff was denied a lunch tray by non-party Corrections Officer Bledsoe) (docket no. 53-11 at p. ID#257); Grievance No. ICF-12-07-1254-17g (on July 12, 2012 plaintiff complained of a mass strip search) (docket no. 53-11 at p. ID#263); and Grievance KCF-10-07-907-20z (on July 17, 2010 plaintiff was given a direct order to stop praying on the prison yard) (docket no. 53-11 at p. ID#267).

   **2.**     **Plaintiff's claims regarding the March 9, 2012 incident involving defendants Kennerly, Mouralis, Wood and Jones**

In his response, plaintiff states that he attempted to exhaust a grievance related to the March 9, 2012 incident. It is difficult to follow plaintiff's explanation for how he "exhausted" this claim. Plaintiff states that on or about March 11, 2012, he "filed a step one grievance about being refused my inhaler, excessive force with gas and c/o's pulling down my underware [sic] and being

8

placed back in the gased [sic] cell without it being cleaned." Plaintiff's Declaration at ¶ 1 (docket no. 67-1 at p. ID#349). Plaintiff also presented copies of an unfiled, unnumbered Step I grievance regarding the March 9, 2012 incident. *See* Step I grievance (docket no. 67-1 at pp. ID# 354-59). Plaintiff stated that on March 27, 2012, he requested a step two grievance "after not recieving [sic] a grievance response." Plaintiff's Decl. at ¶ 2. Plaintiff claims that on or about April 1, 2012, "after grievance coordinator and or c/o's interfered with my grievance process," he "filed a step two with face [sic] letter with warden." *Id.* at ¶ 3 ; Grievance and letters (docket no. 67-1 at pp. ID#354-58).

Plaintiff then "improvised" by filed a Step III grievance directly with the MDOC's Grievance Section in Lansing. Plaintiff's Decl. at ¶¶ 3-4; Grievance and letters (docket no. 67-1 at pp. ID# 359-64). According to plaintiff,

> When I filed the step 3 grievance I was improvising to the best of my ability to follow Policy and I thought I was within Policy pursuant to: Corrections Mental Health Guide Book that states grievances alleging staff corruption and brutality can be sent straight to Step 3. I state this in my face [sic] letter.

Plaintiff's Decl at ¶ 5. The MDOC received the Step III grievance from plaintiff on April 12, 2012, which referenced the incident date of March 9, 2012. Grievance (docket no. 67-1 at pp. ID# 361 and 364). The MDOC rejected this grievance in a letter dated April 17, 2012. *See* Grievance and Rejection (docket no. 67-1 at pp. ID# 360-64). In rejecting the grievance, the MDOC's Grievance Section pointed out that plaintiff failed to include the Step I grievance, the Step I response, the Step II appeal, the Step II response, and a "legible reason for appeal to Step III." *Id.* at p. ID#360. The MDOC further advised plaintiff:

> **You must complete the entire Step I and Step II grievance process before appealing to Step III. (Please refer to the current PD 03.02.130 "Prisoner/Parolee Grievances," effective date 7-9-07. <u>THERE IS NO PROVISION FOR FILING GRIEVANCES DIRECTLY TO STEP III FOR</u>**

9

>    **ANY REASON.)  You should submit this grievance to your facility grievance coordinator, or Inspector, for processing at Step I.**

*Id.* (emphasis in original).  Plaintiff has produced no evidence to demonstrate that he re-submitted a grievance with respect to the March 9, 2012 incident as directed by the April 17, 2012 letter.

Plaintiff's declaration and exhibits do not create a genuine issue of fact sufficient to avoid summary judgment on lack of exhaustion of his March 9, 2012 claims.  The record reflects that plaintiff was aware of the procedure for exhausting grievances, having previously exhausted a grievance through Step III back in 2010.  *See* MDOC Step III Grievance Report (docket no. 53-11 at p. ID#223).  As discussed, plaintiff also exhausted claims against defendants Wellman and McConkey, as well as eight other incidents.  While plaintiff states that he "filed" a Step I grievance on March 11, 2012, he does not explain how he filed it or describe any circumstances which could shed some light on why this particular grievance was not received by the MDOC, other than to make the conclusory statement that an unnamed grievance coordinator "and or" unnamed corrections officers "interfered" with the grievance process sometime before April 1, 2012.  Plaintiff's Decl. at ¶ 3.

Plaintiff's alternative explanation for his personal improvised method of exhaustion is without merit.  According to plaintiff, he discovered that the *Corrections Mental Health Program Mental Health Services Guidebook* allowed him to file grievances involving complaints of discrimination, brutality or staff corruption directly with the warden.  *See* Guidebook (docket no. 69-1).  As discussed, the requirements for exhaustion of prisoner grievances are set forth in MDOC Policy Directive 03.02.130, not a *Guidebook*.  Furthermore, the copy of the *Guidebook* provided by plaintiff (effective April 18, 2005) pre-dates the present policy directive regulating grievances.  *See Curtis v. Caldwell*, No. 2:11-cv-14337, 2012 WL 2974901 at *8  (Report and Recommendation)

10

(E.D.Mich. June 26, 2012), adopted in 2012 WL 2974886 (Order) (July 20, 2012) ("the current version of MDOC PD 03.02.130, which has been in effect since July 9, 2007, does not allow for a grievance to be sent directly to Step III as was the case in a previous version of the policy"); *Winslow v. Vorac*, No. 1:08-cv-229, 2009 WL 1125057 at *5 (W.D. Mich. April 24, 2009) (explaining that while Policy Directive 03.02.130 ¶ R (eff. April 28, 2003) " permitted prisoners to submit grievances alleging racial discrimination or staff corruption or brutality directly to Step III," the current version of Policy Directive 03.02.130 (eff. July 9, 2007) "contains no provision allowing inmates to submit grievances directly to Step III of the grievance process").

Finally, after rejecting the improperly filed grievance, the MDOC gave plaintiff an opportunity to salvage the grievance, advising him that "**You should submit this grievance to your facility grievance coordinator, or Inspector, for processing at Step I.**" Rejection (docket no. 67-1 at p. ID# 360) (emphasis in original). Plaintiff presents no evidence that he re-filed the rejected grievance at Step I as directed by the MDOC. Rather, plaintiff attempts to justify his failure to exhaust by erroneously claiming that he could file the grievance directly at Step III. Viewing this evidence in the light most favorable to the non-movant (plaintiff), there is no factual basis to support plaintiff's claim that he properly exhausted his claims arising from the March 9, 2012 incident. Accordingly, defendants' Kennerly, Mouralis, Wood and Jones' motions for summary judgment should be granted on this claim due to lack of proper exhaustion. *See Jones,* 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91.[2]

---

[2] Plaintiff correctly points out that defendant Kennerly's motion for summary judgment did not comply with W.D. Mich. LCivR 7.1(d), which provides that:

> With respect to all motions, the moving party shall ascertain whether the motion will be opposed. In addition, in the case of all discovery motions, counsel or pro se parties involved in the discovery dispute shall confer in person or by telephone in a good-faith effort

### 3. Plaintiff's other claims

In addition, defendants have presented evidence which establish that plaintiff did not properly exhaust his other claims arising from incidents that occurred on: May 6, 2012; May 14, 2012; August 22, 2013; August 23, 2013; August 27, 2013; August 28, 2013; August 31, 2013; and September 5, 2013.

#### a. Plaintiff's claims regarding the May 6, 2012, and May 14, 2012 incidents involving defendants Shreves and McConkey

Plaintiff does not address exhaustion with respect to the incidents which allegedly occurred on May 6, 2012 and May 14, 2012, and provides the Court with no basis for finding exhaustion. Accordingly, defendants Shreve's and McConkey's motion for summary judgment should be granted on those claims due to lack of proper exhaustion. *See Jones,* 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91.

---

to resolve each specific discovery dispute. All motions shall affirmatively state the efforts of the moving party to comply with the obligation created by this rule.

Here, Kennerly did not comply with the first sentence of the rule, which required him to ascertain whether the motion would be opposed, but he did comply with the third sentence of the rule, explaining his "efforts" (i.e., "Concurrence in the motion has not been sought as Plaintiff is an incarcerated prisoner proceeding *pro se*").. *See* Def. Kennerly Motion (docket no. 78 at p. ID# 491). In this instance, the Court does not find that Kennerly's violation of the rule should result in a dismissal of his motion without prejudice. The rule's concurrence requirement is less likely to provide a benefit in a dispositive motion which could extinguish a party's claim, than in a non-dispositive motion involving pre-trial or procedural matters. In the Court's experience, plaintiffs rarely, if ever, concur in a defense motion seeking summary judgment, because concurrence could be interpreted as an agreement for the granting of the motion and dismissal of the plaintiff's claim. Even if a plaintiff failed to file any response to a motion for summary judgment, the Court could not grant such a motion as unopposed. *See Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 407 (6th Cir. 1992) (the trial court is required to "intelligently and carefully review the legitimacy of such unresponded-to motion" and cannot "blithely accept the conclusions argued in the motion"). For these reasons, the Court will address the merits of the motion for summary judgment. Nevertheless, defendant Kennerly's failure to comply with W.D. Mich. LCivR 7.1(d) may preclude him from collecting any costs or attorney fees should he prevail on his motion.

>    b.   **Plaintiff's claims regarding the August 22, 2013, August 23, 2013, August 27, 2013, August 28, 2013, August 31, 2013, and September 5, 2013 incidents involving defendants Schafer, Badryka, and Haynes**

Plaintiff apparently contends that exhaustion was unavailable for the events which occurred on August 22, 2013, August 23, 2013, August 27, 2013, August 28, 2013, August 31, 2013 and September 5, 2013, based upon this statement in his complaint:

> For claims in unit 2, 8-22-13 and 8-23-13 I submitted step 1 grievance with no response. Then on August 27th I was told if I continue to write grievances, I would be assaulted, so I stopped.

Compl. (docket no. 1 at p. ID# 2).

Plaintiff relies on this statement made in his "verified complaint" to defeat defendants' motion for summary judgment. A verified complaint is considered analogous to an affidavit for certain purposes. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment). Plaintiff apparently takes the position that his complaint was verified under Title 28 U.S.C. § 1746, which authorizes litigants to provide unsworn declarations in lieu of affidavits under oath. Section 1746 provides in pertinent part that such unsworn declaration or verification be subscribed as in writing as true under penalty of perjury, dated, and in substantially the following form:

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

28 U.S.C. § 1746. Here, plaintiff did not follow the form as set forth in § 1746. Rather, he diluted the statutory language by stating:

> I affirm under the penalties of perjury that the information in this complaint is true and correct except as I [sic] statements made upon information and belief and as to these I believe them to be true.
>
> Witness my hand under the penalty of perjury this 8th day of September 2013.

Compl. (docket no. 1 at p. ID# 5).

Plaintiff's affirmance does not unequivocally state that the matters in his complaint are "true and correct" as required under § 1746. While plaintiff's affirmation refers to statements made on "information and belief," his complaint does not differentiate between statements based on personal knowledge and statements based on "information and belief." *See Tenneco Automotive Operating Company, Inc. v. Kingdom Auto Parts*, 410 Fed. Appx. 841, 848 (6th Cir.2010) (trial court could refuse to consider witness' declarations that did not specify which statements were made under information and belief and which were made from personal knowledge).

Consistent with Fed. Rules Civ. Proc. 56(c)(4) and its predecessor, courts have applied a strict personal knowledge requirement to affidavits or declarations submitted in summary judgment proceedings. *See, e.g., Totman v. Louisville Jefferson County Metro Government*, 391 Fed.Appx. 454, 464 (6th Cir. 2010) (to constitute evidence sufficient to support or oppose a motion for summary judgment, an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated;" thus, a complaint which included a verification stating facts that are true and correct to the best of the affiant's "knowledge and belief" indicated that the allegations of the complaint went beyond the plaintiff's personal knowledge, that the allegations extended to matters within the plaintiff's "beliefs," and that the plaintiff's "beliefs" did not meet the evidentiary standard set forth in Fed. Rules Civ. Proc. 56(e)(1) (predecessor to Fed. Rules Civ. Proc. 56(c)(4)); *Alpert v. United*

*States*, 481 F.3d 404, 409 (6th Cir.2007) (holding that the affiant's "statement. . . based upon his 'belief'. . . did not demonstrate the personal knowledge required by Fed.R.Civ.P. 56(e)"); *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (the "personal knowledge requirement [of Rule 56] prevents statements in affidavits that are based, in part, 'upon information and belief' - instead of only knowledge - from raising genuine issues of fact sufficient to defeat summary judgment"); *Dellacava v. Painters Pension Fund of Westchester and Putnam Counties*, 851 F.2d 22, 27 (2d Cir.1988) (statements in an affidavit made "upon information and belief" have "no probative value and may not be considered in a motion for summary judgment"). For these reasons, the Court does not consider plaintiff's complaint to be a "verified complaint" having the same force and effect as an affidavit for purposes of a summary judgment motion. There is no evidence that plaintiff properly exhausted any grievance with respect to his claims arising in August and September 2013. Accordingly, defendants' Schafer, Badryka, and Haynes' motion for summary judgment should be granted on these claims due to lack of exhaustion. *See Jones,* 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91.

### B. Qualified Immunity

Plaintiff contends that defendants Wellman and McConkey retaliated against him by denying him a shower on May 30, 2013. Defendants Wellman and McConkey contend that they are entitled to summary judgment on this claim due to qualified immunity.

> Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 816, 172 L.Ed.2d 565 (2009).

*Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir 2011). The court may exercise its sound discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Defendants Wellman and McConkle contend that they should be granted qualified immunity based on the first prong of the analysis because plaintiff did not establish a constitutional violation. A First Amendment retaliation claim consists of three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Plaintiff has failed to state a claim for retaliation because the denial of a shower on one occasion is not an adverse action for purposes of maintaining a First Amendment retaliation claim. *See Hursey v. Klinesmith*, No. 1:10-cv-1277, 2011 WL 2580403 at *7 (W.D. Mich. June 28, 2011) ("[t]his court has previously found that the denial of a shower on one occasion, however, is not a sufficiently adverse action"); *Williams v. Wise*, No. 2:09–cv–177, 2010 WL 160172 at *3 (W.D. Mich. Jan. 8, 2010) (the denial of a shower on one occasion was not sufficiently adverse to deter a person of ordinary firmness from exercising his constitutional rights). *See also*, *Phelan v. Durniak*, No. 9:10-cv-666, 2014 WL 4759937 at *16 (N.D. N.Y. Sept. 24, 2014) ("the loss of a single shower is too *de minimis* in that it would not deter a similarly situated individual of ordinary firmness from exercising their constitutional rights"). Because plaintiff has failed to allege a constitutional violation against defendants Wellman and McConkey, these defendants are entitled to qualified immunity.

**IV.     Recommendation**

For the reasons set forth above, I respectfully recommend that the motions for summary judgment filed by defendants McConkey, Schafer, Badryka, Maroulis, Wood, Jones, Wellman and Haynes (docket no. 52) and by defendant Kennerly (docket no. 78) be **GRANTED** and that this action be **DISMISSED**.


Dated:  February 9, 2015                             /s/ Hugh W. Brenneman, Jr.
                                                     HUGH W. BRENNEMAN, JR.
                                                     United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).